**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x

MICHAEL NAGUIB,

                        **Plaintiff,**                    **OPINION and ORDER**

         **v.**                               **02-CV-5155 (NG)**

**ASTORIA FINANCIAL CORPORATION**
**d/b/a ASTORIA FEDERAL SAVINGS &**
**LOAN ASSOCIATION, INC.,**

                        **Defendant.**
-------------------------------------------------------------x

**GERSHON, United States District Judge:**

      Plaintiff Michael Naguib brings this action against Astoria Federal Savings & Loan Association ("AFS"), alleging that he was denied promotions to Branch Manager positions on various occasions from January 2000 through May 2001 by his then-employer, AFS, based on his Egyptian national origin and age, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000(e), *et seq*., as amended, the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621-634, as amended, and the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. L. § 297. Defendant moves for summary judgment pursuant to FED. R. CIV. PROC. 56(c) on all claims. Plaintiff has submitted an affidavit in opposition but has filed no Local Civil Rule 56.1 statement in opposition to defendant's Rule 56.1 statement, nor has he filed a legal memorandum.

**Facts**

Unless otherwise indicated, the following facts are undisputed:

**<u>Plaintiff's Background</u>**

Plaintiff Michael Naguib was born in Egypt on January 27, 1955 and came to the United States in 1979. He has an olive complexion and speaks with an accent. Plaintiff holds a degree in microbiology from a university in Egypt. His first job in banking was as a teller with American Savings from 1981 to 1982. In 1982, he resigned his position at American Savings to take a position as senior teller with East River Savings. He received several promotions at East River Savings, ultimately serving as Assistant Branch Manager. In 1990, plaintiff resigned from East River Savings to take an Assistant Branch Manager position with Long Island Savings Bank ("LISB") for higher compensation. He then proceeded to work in various positions below the level of Branch Manager at several of LISB's largest branches.

In late 1998, LISB was acquired by defendant AFS and, during the years 2000-2001, AFS's branches were divided among seven regions, each headed by a Regional Manager. The Branch Managers at all branches within a particular region reported directly to the Regional Manager for that region. During this time period, branch management consisted of a Branch Manager and one or more Assistant Branch Managers at each branch. The primary focus of the Branch Manager position was sales, while the primary focus of the Assistant Branch Manager position was operations and service.

AFS's practice is to post for application all vacancies (below the executive level) which will or may be filled by promotion. Under AFS policy and practice, all employee applications in response to a vacancy posting (whether the applicant is an internal or external candidate) are initially

2

screened by the Human Resources Department to determine if the applicant meets the basic qualifications for the posted position. Upon passing this screening, the applications are reviewed by the hiring manager, and then, typically, the applicants are interviewed by the hiring manager. Once the hiring manager makes a selection, the results are reported to the Human Resources Department which notifies both the successful and unsuccessful applicants. In the case of Branch Manager vacancies, hiring decisions are made by the Regional Managers. If an applicant is unsuccessful for a particular vacancy, and another vacancy is thereafter posted, AFS policy and practice require that the applicant apply again for the new vacancy.

**Plaintiff's Employment with AFS through the Fall of 1999**

Plaintiff became an employee of AFS upon its acquisition of LISB. He assumed an Assistant Branch Manager position and for approximately six months, until about February 1999, plaintiff continued to work at a former LISB branch in Astoria ("35th Street"). Prior to February 1999, plaintiff learned that the 35th Street branch was being closed and that he was going to be transferred to a neighboring branch of AFS in Astoria (the "Main Branch"). Based on a discussion with his new Regional Manager, Russell Rankin, plaintiff initially understood that, upon his transfer to the Main Branch, he would likely begin working as an Assistant Branch Manager in the front end of the branch, assisting the Branch Manager, Jackie DiSanti. Subsequently, but before plaintiff was transferred, Rankin asked that all branch management send resumes "because Russell want[ed] to know a little bit about them." Pltf. Dep. at 39. Plaintiff forwarded a resume which included a reference to the fact that he received a college degree in Egypt. However, plaintiff and Rankin never discussed his resume.

Following the submission of his resume, but before being transferred, plaintiff learned that

his assignment at the Main Branch would be as an Assistant Branch Manager running the teller unit. Plaintiff objected to this assignment because the teller unit was very large and he had no prior experience with AFS's policies and procedures. Plaintiff considered the assignment to be an "overwhelm[ing] task" which he considered "a setup" and "a trap." Pltf. Dep. at 45. Because plaintiff understood that the decision to assign him to the teller unit had been made by Rankin, he requested a meeting with Rankin, his new Regional Manager, in order to discuss the situation. According to plaintiff, Rankin appeared to be angry with plaintiff for questioning his assignment, and stated: "I already made my decision. There is nothing to talk about." Pltf. Dep. at 60. Rankin then ended the meeting abruptly after less than five minutes, without giving plaintiff a full opportunity to express his reasons for disagreeing with the assignment.

Shortly thereafter, plaintiff again spoke with Rankin, apologized for questioning his decision, and told Rankin that, if needed, he would go ahead and work in the back and do his best. According to plaintiff, Rankin refused to accept plaintiff's apology, telling him, "You crossed the line and I'm going to get rid of you." Pltf. Dep. at 68. He did not say that plaintiff would be fired; rather he indicated that plaintiff would not work in the front or in the back of the Main Branch. Rankin never said anything which plaintiff considered to be inappropriate based on race, ethnicity, or age.

Rankin testified in his deposition that he did not have responsibility for promotions or branch assignments during his tenure with AFS. Rankin also noted that he did not have any specific recollection of plaintiff (other than that, at his deposition, plaintiff "look[ed] familiar"), he did not remember any meetings with plaintiff, nor did he recall any assignments being considered or given to him, or having ever asked plaintiff for a resume. Rankin Dep. at 19. Also, Rankin stated that he had no role in plaintiff's assignment to Kew Gardens, discussed below, and indicated that he was

unaware that plaintiff was Egyptian.

Immediately after his encounter with Rankin, plaintiff called Gary Zimbalatti, a manager in AFS's human resources department, and told him of his discussion with Rankin. Zimbalatti advised plaintiff to speak with Rankin's superior (Anthony Marino) and to call Zimbalatti back if he was not satisfied with the outcome. Plaintiff spoke with Marino (whom he had previously worked with at LISB) and told him of his discussions with Rankin. Marino told plaintiff that "he would take care of it." Pltf. Dep. at 76.

After the 35th Street Branch closed, plaintiff reported to work for a short period at the Main Branch, but he was given limited responsibilities. In March or April 1999, he was transferred to the Kew Gardens branch as an Assistant Branch Manager. At the time, Kew Gardens was a small branch where, at least initially, plaintiff was expected to work two days a week as a head teller because of staff shortages. Despite the fact that his pay was not reduced when he transferred to Kew Gardens, plaintiff was unhappy with the assignment because of the size of the Kew Gardens branch and the duties he was expected to perform. Pltf. Dep. at 91-93. According to plaintiff, he complained to Rankin about the assignment to Kew Gardens and asked if the transfer was in response to his earlier complaint about his assignment at the Main Branch. Rankin denied this and told him that Kew Gardens had a history of "lousy performance" and that this was an opportunity for plaintiff to "prove [him]self." Pltf. Dep. at 94.

At or about the same time, plaintiff spoke with Marino who said, "go ahead to Kew Gardens and I will take care of you." Pltf. Dep. at 95. Plaintiff recalls three further conversations with Marino about his career following his transfer. Approximately two months after the transfer, plaintiff "highlight[ed] [his] performance in the branch and highlight[ed] the branch performance

as well." Pltf. Dep. at 97. Marino told him he was "doing an excellent job" and to "keep it up." Pltf. Dep. at 98. AFS's records reflect that plaintiff was consistently rated above average or as "exceed[ing] expectations" in his performance evaluations. Plaintiff received his first performance appraisal at AFS in September 1999 from his Branch Manager Patricia Cestare. His total rating was 5.65 out of a possible score of 8. Plaintiff received his second performance review from his Branch Manager Barbara Barasevic in August 2000. His rating at that time was "Exceeds Expectations," one level below the highest rating of "Exceptional." Briton Aff. Ex. 14; Pltf. Dep. at 221.

At about the end of the third quarter of 1999, plaintiff mentioned the branch's improved performance and Marino responded: "keep it up, I know you can do it, and you have a good future with the bank." Pltf. Dep. at 99. The third conversation occurred after plaintiff learned that his Branch Manager at Kew Gardens, Patricia Cestare, was resigning effective December 31, 1999. Upon learning of Cestare's resignation, plaintiff expected to be promoted as the new Branch Manager. When he learned that "somebody named Barbara" (Barbara Barisevic) was being given the position, he spoke to Marino about his feeling that he was being treated unfairly. Pltf. Dep. at 101. Marino stated that Barisevic had been a Branch Manager for three or four years, that she had lost her prior branch to a Branch Manager who was returning from maternity leave and that "they needed to find a branch for Barbara." Pltf. Dep. at 104. Marino then told plaintiff that he would help to get him a "nice branch." Pltf. Dep. at 102.

At this time, plaintiff concluded that Marino was "lying," since he believed that he was best qualified for the Kew Gardens Branch Manager position, there were other Branch Manager positions to which Barisevic could have been transferred, and the listing for the Kew Gardens position, which should have been posted, was not. Pltf. Dep. at 106. Plaintiff, however, did not complain to

6

Zimbalatti or anyone else in management about the fact that the Kew Gardens position had been filled by Barisevic.

**Plaintiff's Applications for Promotion to Branch Manager**

    1.  The January 2000 Glen Head Vacancy

The first record of request for promotion by plaintiff was in response to a posting for a Branch Manager vacancy in Glen Head in January 2000. After passing the initial Human Resources screening, plaintiff interviewed with Regional Manager Louis Greco, someone with whom he did not have any prior work experience. As far as plaintiff was concerned, the interview went very well; he considered it to be a "friendly atmosphere, comfortable." Pltf. Dep. at 132. Plaintiff does not recall that Greco made any remarks reflecting race, ethnicity, or age-based bias.

AFS records reflect that there were eighteen internal candidates for the posting, seventeen of whom, like plaintiff, were current Assistant Branch Managers; the other applicant was a current Branch Manager. Greco selected Lucrezia Mastroserio for the Glen Head Branch Manager position. Mastroserio had been working for AFS since 1989 and she had been an Assistant Branch Manager at AFS's Massapequa branch, the largest branch in Greco's region in terms of deposit base, sales goals, and transactions. Greco, who had working experience with Mastroserio, considered her performance to be a key reason for the Massapequa branch's success. According to Greco, he selected Mastroserio for the position based on his knowledge of her work and his view that she would be an excellent Branch Manager.

Greco did not consult with other Regional Managers in making his decision and did not discuss plaintiff with Rankin or anyone else. Greco indicated that he was unaware of plaintiff's

ethnicity or age. Also, Greco's notes regarding his reasons for not selecting plaintiff state:

> Mike appears to be a solid Ast. Mgr. At times, during the interview,
> it appeared that Mike was somewhat negative regarding the LISB-
> AFS merger. At this time, I have decided to chose [sic] a candidate
> more suitable for the positions that are open.

Briton Aff. Ex. 15. According to plaintiff, after learning that he was not selected, he left three messages for Greco which were not returned.

Plaintiff believes he was better qualified than Mastroserio based on his observation of her as a trainer on some computer functions. He also believes that his ethnicity was a factor in his not being selected for the Glen Head Branch Manager position because, by his observation, Glen Head "is not a diverse community, and I might not be the right person to be the front window for the bank." Pltf. Dep. at 147. However, no one ever told plaintiff, in connection with the Glen Head application, that he was being denied consideration or a promotion because he did not have the image that AFS wanted to project in any particular community. Pltf. Dep. at 149.

2. The February 2000 Garden City Vacancy

The next record of a request for promotion by plaintiff was in response to a posting for a Branch Manager position at the Garden City branch (a branch roughly twice the size of the Kew Gardens branch in terms of deposit size). Plaintiff interviewed with Regional Manager Kathleen Romagnano, whom he had never met before. The interview was very brief and left plaintiff with the impression that the selection had been predetermined.

AFS records reflect that there were sixteen applicants (eight external, eight internal). All eight of the internal candidates were, like plaintiff, current Assistant Branch Managers. It was Romagnano's practice to conduct short interviews with preset questions which she asked of all applicants. Romagnano recalls that plaintiff did not impress her at his interview and offered no ideas

8

for improving the performance at Garden City, which was a poorly performing branch.

Romagnano selected Carol Clark, an external candidate with experience as a Branch Manager at several other banks, for the Garden City position. She knew Clark from a time when they had previously worked together, and Romagnano felt that Clark, with prior Branch Manager experience, was best suited to take on the current challenges facing the Garden City branch. Plaintiff made no effort to follow up with Romagnano after he was not selected, and he has stated that he does not know if his age or ethnicity was a factor in the denial of the Garden City promotion. Pltf. Dep. at 157.

### 3. The May 2000 Floral Park Vacancy

The next record of request for promotion by plaintiff was in response to a posting for a Branch Manager vacancy in the Floral Park branch (a substantially larger branch than Kew Gardens, both in terms of deposit and staff size) in May 2000. Plaintiff interviewed with Regional Manager Robert Elbogen and he recalls that Elbogen emphasized that Floral Park was much larger than Kew Gardens. According to plaintiff, during the interview, he told Elbogen not to be influenced by his (plaintiff's) accent and that Elbogen said "it's not your accent, my mother doesn't even speak English." Pltf. Dep. at 159.

The Branch Manager position in Floral Park was not filled until August 2000 when a Branch Manager from the Elmont branch was transferred over. According to Elbogen, he decided to fill this position by transfer because he concluded that the Floral Park branch really required an experienced Branch Manager to handle the business.

Elbogen also recalls that he interviewed plaintiff for a vacancy at the Hillside (Jamaica) branch. The Hillside branch was larger in staff size than the Kew Gardens branch, but the applicant

9

pool for the vacancy there consisted of only five internal candidates (all current Assistant Branch Managers) and three external candidates. Christopher Gopie (who is self-identified in AFS's records as "Asian/Pacific Islander") was selected for the Hillside branch. Zimbalatti Aff. ¶ 19. Gopie had worked for Elbogen years earlier at another branch and had received several promotions there. Elbogen stated in his deposition that Gopie had a "work ethic [which] was exceptional, . . . was very qualified for the job," "was extremely gifted . . . and did an exceptional job." Elbogen Dep. at 13, 26.

According to Elbogen, he did not know that plaintiff was Egyptian and he did not know his age. Further, he recalls that "Michael ruled himself out. Michael didn't come prepared for the interview . . . [and he] didn't come knowledgeable of the location he was looking to interview for." Elbogen Dep. at 25. As Elbogen explained, "Michael didn't blow me away. He wasn't the most impressive candidate. Chris was." Elbogen Dep. at 36. Nonetheless, plaintiff believes his ethnicity was a "big factor" in the decision for the Hillside branch position because Elbogen is Jewish and because "during the course of the interview he [Elbogen] was sort of putting down the Kew Gardens branch." Pltf. Dep. at 164.

### 4. The February 2001 Woodside Vacancies

The next record of a request for a promotion by plaintiff was in response to a posting for a Branch Manager vacancy in Woodside in February 2001. An external applicant, Valerie Sheppard, was initially hired for the position but left within a month of being hired, and the position was then filled with an internal applicant. The Woodside branch was roughly double the size of the Kew Gardens branch, where plaintiff worked, and was considered one of the most complex branches in its region. There were two internal and three external applicants for the original vacancy. The

Regional Manager responsible for the Woodside promotion was Bruce Kaplan, who was also the Regional Manager responsible for the Kew Gardens branch.  Sheppard, the woman initially hired, had been a "cluster manager" for CFS Bank where she was responsible for managing several branches and gained experience which Kaplan described as "running a large branch and dealing with the large numbers of employees."  Kaplan Dep. at 49.  Kaplan knew plaintiff in his role as Assistant Branch Manager at Kew Gardens, and he was generally familiar with plaintiff's abilities.  Although Kaplan does not have a present recollection of plaintiff applying for the Woodside vacancy, he has testified that he would not have considered plaintiff a viable candidate for the Woodside Branch Manager position because he had no prior experience as a Branch Manager.  As Kaplan stated, "in general, a branch like Woodside, I would never fill with a new manager."  Kaplan Dep. at 48-49.

Shortly after Sheppard's departure, the Woodside Branch Managership was filled by an internal applicant named Anna Puente.  Kaplan Dep. at 14.  Puente had served previously as a Branch Manager in Kaplan's region.  Kaplan Dep. at 15.  Plaintiff alleges that Kaplan was engaged in "an inappropriate social relationship" with Puente, and he suggests that this relationship was a motivating factor in Kaplan's decision to hire her.  Naguib Aff. ¶¶ 9-11.

Plaintiff was never interviewed for either vacancy at the Woodside branch, and he believes that he was denied interviews and a promotion to the Woodside branch because Kaplan is Jewish and because Kaplan, at one point, mentioned his religion to plaintiff.  Pltf. Dep. at 172.  Plaintiff testified that Kaplan "mentioned on many occasions that he lived in Brooklyn and with the Jewish people with the hats and all that stuff in couple meetings.  But like in a joke matter and make sure that he – make sure everybody knows that he is Jewish."  Pltf. Dep. at 172.  When asked at his

deposition "[o]ther than your feeling that because Kaplan was Jewish and you were Egyptian, that he would not promote you, do you have any other basis for believing that your ethnicity was a factor in his decision?", plaintiff responded "[t]hat's the prime reason that I have in my mind and I have nothing else." Pltf. Dep. at 173. However, in his affidavit, plaintiff asserts, "Kaplan stated that the Jews were beginning to control [AFS] in the same way Jews were running the country. He mentioned that several Jews were regional managers at [AFS]. Elboken [sic], Kaplan, and Ostrawsky [sic] were all Jewish Regional Managers." Naguib Aff. ¶ 12. Plaintiff emphasizes that this information is relevant because of what he describes as a "Middle East conflict between the Jews in Israel and the Arabs, of which I am one." Naguib Aff. ¶ 16. Thus, because plaintiff is Egyptian, he believes that the regional managers' (particularly Kaplan's) religion was a factor in their hiring decisions.

5. The May 2001 Brooklyn Vacancies

The next record of a request for promotion by plaintiff was in response to a posting for three Branch Manager vacancies in Brooklyn in May 2001. There were six internal and sixteen external applicants for these positions. The Regional Manager responsible for these promotions was Larry Oskowsky. During the interview, plaintiff spoke with Oskowsky about the Kew Gardens branch, which was smaller than the Brooklyn branches for which plaintiff was interviewing.

Oskowsky did not know plaintiff personally prior to his interview, but recalls that plaintiff was not particularly impressive at his interview. He remembers that in response to questions about how he would handle specific operational issues, plaintiff answered broadly without specifics. Oskowsky stated that he was not aware of plaintiff's national origin or age and that these subjects were never discussed during the interview. Oskowsky stated that he attempted to select applicants

who were either familiar with the branches' communities or experienced as a Branch Manager.

For one of the vacancies in Brooklyn (Park Slope), Oskowsky selected George Galanis. Galanis earlier had worked for Oskowsky at another branch as a management trainee and Assistant Branch Manager, was thoroughly familiar with the area, had won several awards within AFS, and according to Oskowsky, was aggressive and successful in improving that branch's performance. According to plaintiff, there was discussion within the Queens Region that Galanis had been responsible for a serious operational incident while Assistant Branch Manager at Woodside, and that there were other disciplinary memos in his file. However, there is no record regarding the incident or other disciplinary memos in Galanis's file, and Oskowsky was unaware of these allegations at the time he selected Galanis.

Oskowsky selected Ray Trioso for the Fifth Avenue vacancy. Trioso had experience as a Branch Manager with Fleet Bank and had most recently been working as the owner of his own construction company. Oskowsky was very pleased with Trioso's combination of banking and business experience, and Trioso made an excellent impression at his interview. Following the interview, at Oskowsky's request, his superior (Anthony Marino) also interviewed and approved Trioso.

For the Coney Island Branch Manager vacancy, Oskowsky selected Joe Festa. Festa has been a Branch Manager for Apple Bank at a nearby branch for over two years. Oskowsky considered him an excellent selection based on his experience as a Branch Manager and his knowledge of the local community.

When plaintiff was not selected for the Brooklyn positions, he tried to contact Oskowsky, but did not get a return call. Nothing was said in the interview which plaintiff considered as

inappropriate based on race, ethnicity, or age.  However, plaintiff believes that his ethnicity and/or age were factors in his failure to receive these promotions because he felt that too much emphasis during the interviews was put on the fact that he was employed at the small Kew Gardens branch and not enough attention was given to his prior experiences at larger branches.

6. <u>The May 2001 Hastings Vacancy</u>

The last record of a request for promotion by plaintiff was in response to a posting for a Branch Manager vacancy in Hastings in May 2001.  There were two internal candidates (plaintiff and an Assistant Branch Manager from another Westchester branch) and two external candidates for this position.  Bruce Kaplan was once again the Regional Manager responsible for this promotion.  However, unlike the earlier Woodside vacancy, Kaplan himself interviewed plaintiff.

Plaintiff came to the interview with a PowerPoint presentation, including sound effects, which he believed would separate him from the other candidates.  According to plaintiff, Kaplan made a "big joke out of [his] presentation" and was "very sarcastic" about it.  Pltf. Dep. at 192, 193. Kaplan  stated in his deposition that he was not sarcastic, but remembers "being kind of surprised because that was the first time [he'd] ever interviewed anyone and had a PowerPoint presentation presented to [him]."  Kaplan Dep. at 37.  During the course of the interview, Kaplan asked some questions about the Kew Gardens branch and noted that he was not sure if either plaintiff or the other internal applicant could "handle" the position.  Pltf. Dep. at 195.

Although Kaplan said nothing that plaintiff considered inappropriate based on race, ethnicity, or age, plaintiff believes that his ethnicity and/or age were a factor in the decision because he left the interview with the feeling that something was "holding [him] back."  Pltf. Dep. at 197.

Kaplan selected Beverly Willock for the Hastings vacancy.  He knew Willock before

interviewing her from a period when they worked together at Dime Savings, and she had earlier contacted Kaplan about potential positions with the Bank. Willock had been a Branch Manager for Dime Savings for approximately four years. According to Kaplan, he selected Willock because he knew her to be "a successful manager in a complex branch in the Bronx for Dime. [He] had known her to be successful in meeting her sales goals and operationally sound." Kaplan Dep. at 52.

       7.  <u>The Accounting Position</u>

Although AFS has no record of it, plaintiff claims that he sought an accounting position in late 2000. According to plaintiff, the position was subsequently cancelled and later reopened in April or May 2001, but he did not apply for the reopened position.

**Additional Facts Asserted in Plaintiff's Affirmation**

Plaintiff alleges that several comments were reported to him by others suggesting that he was being held back for unspecified reasons. Among others, plaintiff states that he was told (1) by a Branch Manager (DeSantis) that a Regional Manager (Rankin) "said he wanted to get rid of me" Naguib Aff. ¶ 5 ; (2) by two Branch Managers at the Kew Gardens branch the he was on a "hit list" Naguib Aff. ¶ 7; (3) by a Regional Vice President (Marino) that he would be given a promotion; and, (4) by a Human Resources representative (Judy Beth Wagner) that he was the only internal applicant for the Woodside Branch Manager position. Plaintiff also alleges that, while working with Marino at LISB, Marino made a comment to the effect that "only the Egyptian can afford" an expensive car similar to the one that plaintiff had just purchased. Pltf. Dep. at 116. Further, plaintiff claims that during their time together at LISB, Marino was present when co-workers called plaintiff "the Sheik." Naguib Aff. ¶ 6. Finally, plaintiff claims that he was more experienced than some of the persons

selected to fill the Branch Manager positions and that several witnesses, most notably Rankin and Kaplan, "lied" or suffered "amnesia" when they did not remember certain events as recalled by plaintiff. Naguib Aff. ¶ 18.

**Plaintiff's Employment Terminates in August 2001**

Following discovery of a theft by the operations supervisor at the Kew Gardens branch in July 2001, AFS conducted an audit of procedures at that branch. The operations supervisor was discharged. Both plaintiff and the Branch Manager (Barisevic) were given the option to resign or be terminated. Both elected to resign. Plaintiff's employment terminated effective August 17, 2001. At the pre-motion conference on July 19, 2004, counsel for plaintiff stated that plaintiff's claims in this action are limited to the denial of promotions and that he is not asserting a discrimination claim in connection with the termination of his employment.

**Standard**

A motion for summary judgment is properly granted where there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. PROC. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Lipton v. Nature Co.*, 71 F.3d 464, 469 (2d Cir.1995). The burden is on the moving party to demonstrate that there are no material facts genuinely in dispute. *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000). In deciding a motion for summary judgment, the court must view the inferences to be drawn from the facts in the light most favorable to the party opposing the motion. *Howley v. Town of Stratford*, 217 F.3d 141, 150-151 (2d Cir. 2000); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The non-moving party must produce specific facts sufficient to establish that there is a genuine factual issue for trial. *Celotex Corp.*, 477 U.S. at 322-23. A motion for summary

16

judgment cannot therefore be defeated by "mere speculation or conjecture." *Giordano v. City of New York*, 274 F.3d 740, 749-50 (2d Cir. 2001). Summary judgment is appropriate if the evidence produced would not allow any reasonable jury to find in favor of the nonmoving party. *See Mitchell v. Shane*, 350 F.3d 39, 47 (2d Cir. 2004).

In employment discrimination actions, courts are particularly cautious about granting summary judgment where intent is at issue. This is because "a victim . . . [is] seldom able to prove his or her claim by direct evidence and is usually constrained to rely on the cumulative weight of circumstantial evidence." *Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991). Consequently, where a defendant's intent and state of mind are placed at issue, summary judgment is ordinarily inappropriate." *Id.* On the other hand, "the summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985), *cert. denied*, 474 U.S. 829 (1985); accord *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000). Therefore, in the discrimination context, a plaintiff "must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment." *Schwapp v. Town of Avon*, 118 F.3d 106, 109 (2d Cir. 1997).

In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 793 (1973), the Supreme Court set forth the burden-shifting framework for discrimination cases. *See Raskin v. Wyatt Co.*, 125 F.3d 55, 60 (2d Cir. 1997) (framework the same in Title VII and ADEA cases). First, a plaintiff claiming that he was denied promotions based on discrimination must make a prima facie case showing that: (1) he is a member of a protected class; (2) he applied and was qualified for a position for which the employer was seeking applicants; (3) he was rejected for the position; and, (4) he was denied the

position under circumstances giving rise to an inference of discrimination. *See, e.g., Brown v. Coach Stores, Inc.*, 163 F.3d 706, 709-10 (2d Cir. 1998); *Subramanian v. Prudential Securities, Inc.*, No. CV-01-6500, 2003 U.S. Dist. Lexis 23231 (E.D.N.Y. Nov. 20, 2003); *Gadsen v. Jones Lang Lasalle Americans, Inc.*, 210 F. Supp. 2d 430, 442 (S.D.N.Y. 2002).

Once a plaintiff has established all four elements of the prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its decisions. Once an employer has done so, the presumption of discrimination drops from the case, *St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993), and the burden shifts back to the plaintiff to prove "that the legitimate reasons offered by the defendant . . . were a pretext for discrimination." *Reeves v. Sanderson Plumbing Prods.*, Inc., 530 U.S. 133 (2000). Proof of pretext alone, however, is not necessarily sufficient to defeat a motion for summary judgment. *See St. Mary's*, 509 U.S. at 524 ("proof that the employer's proffered reason is unpersuasive does not necessarily establish that plaintiff's proffered reason is correct"). "Once a minimal prima facie case is proved and the employer's nondiscriminatory explanation has been given, the *McDonnell Douglas* presumptions disappear from the case and the governing standard is simply whether the evidence, taken as a whole, is sufficient to support a reasonable inference that prohibited discrimination occurred." *James v. New York Racing Assoc.*, 233 F.3d 149, 156 (2d Cir. 2000).

## Discussion

Plaintiff can establish the first three prongs of his prima facie case, since he can prove that he was a member of a protected class (Egyptian national origin and over age 40), that he was qualified for the promotions he sought, and that he was not selected for these positions. However,

plaintiff cannot establish the fourth prong of his prima facie case because he cannot prove that he was denied the promotions under circumstances giving rise to an inference of discrimination.

Plaintiff's belief that he was discriminatorily denied promotion is conclusory. Plaintiff has produced no statistics of any kind supporting his claims. The record is devoid of any attempt by the plaintiff to contrast his national origin with those of the individuals selected for the positions he was denied. While plaintiff alleges in his affidavit that "all of the successful candidates for the various branch manager positions were under forty," (Naguib Aff. ¶ 14) he has produced no evidence to support this assertion. Even assuming, *arguendo*, that the individuals selected over plaintiff were both younger and members of a different nationality, plaintiff has failed to make the necessary demonstration that defendants were aware of this fact. *See Woodman v. WWOR-TV Inc.*, 411 F.3d 69, 82-83 (2d Cir. 2005) ("a defendant's discriminatory intent cannot be inferred, even at the prima facie stage, from circumstances unknown to the defendant. Thus, in an ADEA case, where a plaintiff relies on a substantial age discrepancy between herself and her replacement, she must adduce some evidence indicating defendants' knowledge as to that discrepancy to support the inference of discriminatory intent required by the fourth prima facie factor.").

Looking beyond these significant omissions, plaintiff's proffered evidence suffers from multiple deficiencies. For some promotions, specifically Glen Head and Brooklyn, he believes his ethnicity was a factor because his national origin did not fit the communities in which the vacancies existed. In the case of Floral Park/Hillside, Woodside, and Hastings, plaintiff believes that his ethnicity was a factor in the hiring decisions, since the Regional Managers responsible for filling these positions were Jewish. Finally, with regard to the other promotions, plaintiff relies on the fact that the interviewers did not ask questions that he was prepared for, that they emphasized that he was

working at a small branch (Kew Gardens), and that he did not get feedback from the interviewers after he was not selected.

Notwithstanding plaintiff's beliefs, the foregoing facts are insufficient to prove that plaintiff was denied the promotions under circumstances giving rise to an inference of discrimination. "An inference is not a suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact [that is known to exist]." *Bickerstaff v. Vasser College*, 196 F.3d 435, 448 (2d Cir. 1999) (quoting 1 Leonard B. Sand, et al., Modern Federal Jury Instructions ¶ 6.01, instr. 6-1 (1997)). Plaintiff acknowledges that no one ever told him he was denied a promotion because he did not project the image that AFS wanted in any particular community. Also, he concedes that, during the interviews, none of the managers made any remarks which he considered to be biased.[1] "In determining whether a genuine issue of material fact exists for trial, [courts] are obliged 'carefully [to] distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture.'" *Woodman*, 411 F.3d at 75 (quoting *Bickerstaff*, 196 F.3d at 448). While the court recognizes that "discrimination will seldom manifest itself overtly," *Bickerstaff*, 196 F.3d at 448, here, plaintiff's claim of discrimination is based on no evidence other than his personal beliefs, and therefore he cannot establish a prima facie case of discrimination.

In his affidavit in opposition to defendant's motion for summary judgment, plaintiff relies on a number of alleged comments that he claims create triable issues of fact. Even were it proper to allow plaintiff to rely on facts not presented in his deposition, these alleged comments, some of which are hearsay, are insufficient to defeat summary judgment. For example, plaintiff states that

---

[1] Other than one occasion when plaintiff himself raised the subject of his accent (to which the interviewer responded that his accent was irrelevant), plaintiff's age and/or national origin were never discussed.

he was told (1) by a Branch Manager (DeSantis) that a Regional Manager (Rankin) "said he wanted to get rid of me," Naguib Aff. ¶ 5; (2) by two Branch Managers at the Kew Gardens branch that he was on a "hit list," Naguib Aff. ¶ 7; (3) by a Regional Vice President (Marino) that he would be given a promotion; and, (4) by a Human Resources representative (Judy Beth Wagner) that he was the only internal applicant for the Woodside Branch Manager position. Contrary to plaintiff's claim, these alleged remarks are insufficient to create triable issues of fact because they are neither probative of discriminatory animus, nor do they support a claim of discrimination. *See Manessis v. New York City Dept. of Transp.*, No. 02 Civ. 359, 2003 U.S. Dist. Lexis 1921, *17-18 (S.D.N.Y. Feb. 10, 2003) (comments that do not evidence discriminatory bias should not be considered in assessing the validity of a discrimination claim), *aff'd sub nom. Manessis v. Chasin*, 86 Fed. Appx. 464 (2d Cir. 2004), *cert. denied*, 125 S. Ct. 1928 (2005).

Plaintiff also argues that there is a triable issue of fact based on an alleged comment by one of the hiring managers (Kaplan), that "Jews were beginning to control [AFS] in the same way Jews were running the country" and based on the fact that, while employed at LISB, a manager (Marino) overheard co-workers refer to plaintiff as "the Sheik." Naguib Aff. 6, 12. Plaintiff did not testify about these remarks at his deposition, but only in his affidavit, submitted in opposition to the motion for summary judgment. Even assuming that Kaplan actually made the remark attributed to him, and that Marino overheard the co-worker remark, these comments do not suggest that plaintiff was discriminated against during the promotion process. Both comments can be classified as "stray remarks." *See Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir.) ("The stray remarks of a decision-maker, without more, cannot prove a claim of employment discrimination"), *cert. denied*, 534 U.S. 993 (2001).

Plaintiff also argues that there is triable issue of fact based on his assignment as an Assistant Branch Manager at the Kew Gardens branch, because he claims that this assignment stigmatized him as someone lacking experience. He fails to show how this assignment evidences discrimination.

Finally, plaintiff's claims about Kaplan's alleged inappropriate relationship with an individual whom Kaplan promoted do not support plaintiff's case. Even if Kaplan did promote, over plaintiff, someone with whom he was having a relationship, his preference for an alleged paramour only weakens plaintiff's argument that Kaplan did not hire him because of his national origin and age. As the Supreme Court indicated in *Reeves*, even if a plaintiff can prove that a defendant's stated reason for taking an adverse action was false, the plaintiff must still show that the true reason was a discriminatory one. 530 U.S. at 147. Accordingly, the circumstances of Kaplan's termination do not support plaintiff's claim of discrimination on the basis of his national origin or age.

Even assuming, *arguendo*, that plaintiff can establish a *prima facie* case of discrimination, plaintiff cannot defeat summary judgment. After a *prima facie* case is established, the burden shifts to the defendant to articulate a legitimate non-discriminatory reason for its decisions. *Reeves*, 530 U.S. at 142. This burden is one of production, not persuasion. *Id.* For each position to which plaintiff applied in 2000-2001, the defendant has articulated non-discriminatory reasons for the selection of other employees over plaintiff, and, based upon the entire record, no reasonable jury could find that these reasons were mere pretexts for discrimination.

1. Glen Head/Glen Cove/Massapequa Park

Only three of eighteen internal candidates were selected for these positions. The person selected for Glen Head (Mastroserio) had worked for the interviewing Regional Manager at the

largest branch in his region and was known to him as an excellent worker. The person selected for Glen Cove (Stanko) was already a Branch Manager and was simply being moved to a larger branch. Also, the hiring Regional Manager had previously worked with Stanko in another capacity. The person selected for Massapequa Park (Rogers) was a current Assistant Branch Manager. Rogers had been very successful in her work at that branch, she had worked with the hiring manager in the past, and was considered to be the most suitable candidate for the position. Plaintiff, on the other hand, was largely unknown to the hiring manager since he worked at a very small branch in another region and, according to the hiring manager, during his interview, plaintiff expressed negativity toward the recent merger which had resulted in his employment at AFS.

### 2. Garden City

One of sixteen candidates was selected for this position. The hiring Regional Manager (Romagnano) selected an internal candidate with whom she had worked at another bank. The selected candidate had extensive experience as a Branch Manager and was considered to be best suited to the needs of a large struggling branch. In contrast, plaintiff did not make a positive impression at his interview, had never worked with the hiring manager, and worked at a branch roughly half the size of Garden City.

### 3. Floral Park/Hillside

There were eight candidates for the positions in Floral Park and Hillside (plaintiff recalls interviewing for the Floral Park position, while the hiring manager recalls interviewing him for the Hillside position). The Floral Park position was not filled by any of the candidates. Instead, it was

filled several months later by the transfer of a Branch Manager from another branch. The transfer was made after the hiring manager determined that he needed an experienced Branch Manager to handle Floral Park, a branch substantially larger than the Kew Gardens branch at which plaintiff was employed. The candidate selected for the Hillside branch (Gopie) had previously worked with the hiring manager at another branch, had received several promotions, had completed AFS's management training program, and was viewed by the hiring manager as "exceptional." Elbogen Dep. at 13, 26. Plaintiff, in contrast, did not appear prepared for the interview and was not viewed as the most qualified candidate.

### 4. Woodside

There were five candidates for this position. The Woodside branch was substantially larger than Kew Gardens and was considered one of AFS's most complex branches. An external applicant (Sheppard) was selected for the Woodside position. Among her qualifications was that she had been a cluster manager for another bank, where she was responsible for managing several branches and a large number of employees. By contrast, the Kew Gardens branch was within the hiring manager's (Kaplan) region, and he was generally aware of plaintiff's abilities. Because of the size and complexity of the Woodside branch, Kaplan explained that he would not even consider filling it with a new manager.

### 5. Brooklyn (Park Slope/Fifth Avenue/Coney Island)

Three of twenty-two candidates were selected for these positions. The candidate selected for Park Slope (Genanis) previously had worked with the hiring manager, was viewed as critical to

the success of the branch, was thoroughly familiar with the area, had worked as an Assistant Branch Manager at some of AFS's larger branches, had won several awards, and was the subject of very positive reports. The successful external candidate for Fifth Avenue (Trioso) had both prior Branch Manager experience with another bank and business experience as owner of his own construction company. The successful candidate for Coney Island, also external (Fasto), had several years of experience as a Branch Manager in the local community.

6. Hastings

There were four candidates for this vacancy. The hiring manager (Kaplan) knew the selected candidate (Willock) from a time they had worked together at another bank, where he knew her to be a successful Branch Manager in a complex branch. Kaplan had been instrumental in Willock's application for various positions at AFS. At the time Willock was selected, she had four years of Branch Manager experience and Kaplan considered her to be the strongest candidate for the position.

As the foregoing facts demonstrate, there is a legitimate non-discriminatory basis for each of the decisions made by the Regional Managers in selecting persons other than plaintiff for the Branch Manager vacancies. The courts may not second guess an employer's good faith business decisions. *See, e.g., Jetter v. Knothe Corp.*, 200 F. Supp. 2d 254, 262 (S.D.N.Y. 2002), *aff'd*, 324 F.3d 73 (2d Cir. 2003); *Gray v. Robert Plan Corp.*, 991 F. Supp. 94, 100 (E.D.N.Y. 1998). The undisputed facts establish that each of the selected candidates possessed credentials which a Regional Manager could reasonably have concluded were superior to plaintiff's. Of the eleven

positions for which plaintiff was under consideration, seven were filled by individuals who, unlike plaintiff, had prior experience as Branch Managers. Of the four Assistant Branch Managers who were promoted, all had prior successful working experience with the hiring managers and two were current Assistant Branch Managers at the branches at which they were promoted. Thus, plaintiff has failed to establish that these promotional decisions were not made in good faith.

Not only has plaintiff failed to raise an issue of fact as to the truth of defendant's stated reasons for selecting other applicants for the various Branch Manager vacancies, he has not offered sufficient proof that the true reason for not selecting him was a discriminatory one (*i.e.* that one or more of these Regional Managers was motivated by plaintiff's national origin or age).[2] Plaintiff's claim can only be seen as a subjective belief that he was discriminated against. This is insufficient to prove that defendant's reasons are pretexts for discrimination.

Plaintiff cannot rely merely on the fact that he was repeatedly denied promotions. Summary judgment has been granted in a variety of cases where multiple promotions were denied. *See e.g., Subramanian*, 2003 U.S. Dist. Lexis 23231; *McHawi v. State University of New York Empire State College*, 90 Civ. 7063, 1994 U.S. Dist. Lexis 12261 (S.D.N.Y. Sept. 1, 1994). In all of the hiring decisions, there were numerous other unsuccessful applicants besides plaintiff (ranging from three for the Hastings vacancy to as many as nineteen for the Brooklyn positions). Also, twenty-one other

---

[2] Four of the five hiring managers (Greco, Romanagno, Elbogen, and Oskowsky) had not worked with plaintiff and indicated that they had no knowledge of his national origin or age. *See Woodman*, 411 F.3d at 86 (holding plaintiff failed to establish prima facie case where plaintiff did not produce evidence that defendants were "aware of her age relative to that of the employee to whom her sales responsibilities were transferred."). The fifth hiring manager, Kaplan, did not know plaintiff's age and believes himself to be (and is) older than plaintiff. Where a decision maker is in the same protected classification as the alleged victim of discrimination, claims of discrimination become less plausible. *Marlow v. Office of Court Admin. of New York*, 820 F. Supp. 753, 757 (S.D.N.Y. 1993), *aff'd* 22 F.3d 1901 (2d Cir.), *cert. denied*, 513 U.S. 897 (1994); *Johnson v. The Reuben H. Donnelly Corp.*, 95 Civ. 10397, 1997 U.S. Dist. Lexis 13972, *4-5 (S.D.N.Y. 1997). While this does not end the inquiry, it provides an additional inference which plaintiff must overcome. *Marlow*, 820 F. Supp. at 757.

Assistant Branch Managers applied for one or more of these promotions without being selected for any of the Branch Manager vacancies.

In sum, plaintiff cannot meet his ultimate burden of proving that he was the victim of unlawful employment discrimination.

**Conclusion**

For the reasons set forth above, defendant's motion for summary judgment is granted in its entirety. The Clerk of Court is directed to enter judgment for the defendant.

**SO ORDERED.**

**Dated: Brooklyn, New York**
       **July 25, 2005**

                                        _____/s/_____
                                        **NINA GERSHON**
                                        **United States District Judge**